**PLAQUEMINES PORT, HARBOR AND TERMINAL DISTRICT, Petitioner,**

v.

**FEDERAL MARITIME COMMISSION and United States of America, Respondents,**

New Orleans Steamship Association, Intervenors.

**NEW ORLEANS STEAMSHIP ASSOCIATION, Petitioner,**

v.

**FEDERAL MARITIME COMMISSION and United States of America, Respondents,**

Association of Ship Brokers and Agents, Inc., Plaquemines Port, Harbor and Terminal District, Intervenors.

Nos. 86–1517, 86–1622.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 23, 1987.

Decided Feb. 2, 1988.

Edward S. Bagley, for petitioner in No. 86–1622 and intervenor in No. 86–1517, New Orleans Steamship Assn.

Edward J. Sheppard, for petitioner in No. 86–1517 and intervenor in No. 86–1622, Plaquemines Port, Harbor and Terminal Dist.

Robert J. Wiggers, Atty., Dept. of Justice, with whom John P. Powers III, Atty., Dept. of Justice, was on brief, for respondent, U.S. Kenneth G. Starling, Atty., Dept. of Justice, also entered an appearance for respondent, U.S.

John M. Binetti, Atty., Federal Maritime Com'n, with whom Robert D. Bourgoin, Gen. Counsel, Federal Maritime Com'n, was on brief, for respondent, Federal Maritime Com'n.

J. Alton Boyd, for intervenor Association of Ship Brokers and Agents (U.S.A.), Inc., in No. 86–1622.

Before WALD, Chief Judge, BORK, Circuit Judge, and GIBSON[*], Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge BORK.

BORK, Circuit Judge:

## I.

These consolidated cases arise from petitions for review of a Federal Maritime Commission ("FMC") order. The FMC ruled that, under the Shipping Act of 1984 ("1984 Act"), it had jurisdiction over Plaquemines Port, Harbor and Terminal District ("Port") and therefore had the authority to review the tariff imposed by the Port. The FMC found the tariff lawful in most respects but ruled that three exemptions to the tariff violated the anti-discrimination and reasonableness standards of the 1984 Act. New Orleans Steamship Association ("NOSA"), the complainant below, also argued to the agency that the tariff violated the tonnage clause of the U.S. Constitution. The FMC declined to reach that issue.

The Port petitions for review of the FMC order, arguing that its exemptions do not violate the reasonableness and anti-discrimination standards of the 1984 Act. NOSA also seeks review of the order, contending that the provisions of the tariff which impose liability on vessel agents and vessels operating under FIO[1] contracts are unreasonable and violate the 1984 Act. Before this court, NOSA renews its claim that the tariff violates the tonnage clause.

We affirm the FMC's order in all respects. Furthermore, we reach the constitutional issue and hold that the tariff does not violate the tonnage clause of the U.S. Constitution.

## II.

### A.

Plaquemines Parish (the "Parish") has a unique geographical position. A peninsula surrounded by the Gulf of Mexico, it is the southernmost parish in Louisiana, and is dominated by the Mississippi River. Virtually all of the Parish lies below sea level; habitation is possible only because of massive levees which keep back the waters of the Gulf of Mexico. The permanent population of the Parish consists of 26,000 people. Ninety-four percent of the Parish lies outside the protection of the levees and is susceptible to tides. Most points on dry land are no more than one or one-half of a mile from the river. There are no bridges but two highways run north and south, one on each side of the river. *New Orleans S.S. Ass'n v. Plaquemines, Port Harbor & Terminal Dist.*, 23 S.R.R. (P & F) 705, 707–08 (I.D.1985) [hereinafter "*NOSA Initial Decision*"], *adopted*, 23 S.R.R. (P & F) 1363 (FMC 1986) [hereinafter "*NOSA Order*"]. From the northern limits of the Parish to the southwest pass of the river which empties into the Gulf, the Parish extends a total of 102 miles. *NOSA Initial Decision*, 23 S.R.R. (P & F) at 708.

Every oceangoing vessel serving any port on the Mississippi (for example, New Orleans, Baton Rouge, Gramercy, Destrehan, and St. Rose) passes through the Parish going upriver and again going downriver. Approximately 9,200 such vessels arrive and depart through the Parish annually, for an average of approximately one oceangoing vessel each hour. *NOSA Initial Decision*, 23 S.R.R. (P & F) at 708. Approximately 3,876 of those vessels either dock or anchor within the Parish.

The Port is a political subdivision of the State of Louisiana and is geographically coextensive with the Parish. Thus, the Port is actually a 102–mile stretch of river. The governing body of the Port is the same

---

[*] Of the United States Court of Appeals for the Eighth Circuit, sitting by designation pursuant to 28 U.S.C. § 294(d) (1982).

1. FIO means "free in and out" and describes a maritime term under which, pursuant to the contract between the vessel and the cargo interests, the cargo is liable for all charges.

as the governing body of the Parish. *NOSA Initial Decision*, 23 S.R.R. (P & F) at 707.

Unlike virtually all other municipal ports, the Port neither owns nor operates wharves, docks or other waterside facilities. *See NOSA Order*, 23 S.R.R. (P & F) at 1366; Reply Brief for New Orleans Steamship Association at 3 [hereinafter "Reply Brief"]. All the terminal facilities alongside the river are privately owned. *Id.* The Port, however, does operate two patrol/rescue/fire vessels. In addition to fire fighting capacity, each vessel is equipped with a boarding platform for rescuing people from the water with facilities for medical emergencies. These fire vessels are staffed twenty-four hours a day with a total crew of six deckhands, six captains, and one maintenance man. *NOSA Initial Decision*, 23 S.R.R. (P & F) at 724. The fire boats are available to transport emergency medical teams, firemen, and other emergency personnel. They also patrol the Port to detect pollution violations by vessels and aid in the water quality sampling program. *Id.* at 725.

The Port has executed a fire fighting plan with the Coast Guard, under which the Port has the primary responsibility for furnishing fire and rescue protection within the Port. *NOSA Initial Decision*, 23 S.R.R. (P & F) at 732. In addition, the Port has acquired a snorkel truck, bigger than that which it would otherwise need, absent the possibility of vessel fires. It has refitted a ferry, has an auxiliary fire fighting vessel, and has purchased chemical foam and land-based marine pumping units. *Id.* at 725–26.

The Port also owns and operates a helicopter, a seaplane, and a marine communications system. The marine communications system, like the fire vessels, is staffed twenty-four hours a day. *NOSA Initial Decision*, 23 S.R.R. (P & F) at 726. The cost of the Port's services, calculated separately from other Port costs, was $1,242,168.00 for the calendar year 1983, *id.* at 727, and $1,394,369.00 for the calendar year 1984. *Id.* at 729.

## B.

The Port's attempts to charge a tariff for its fire and emergency services, and the attempts of various interests in the shipping industry to prevent the Port from doing so, began ten years ago. In 1977 the Port adopted the first of three tariffs. This tariff ("Tariff I"), like the tariff at issue here ("Tariff II"), was instituted for the purpose of "defraying necessary and essential, direct and indirect, port, harbor and marine services to port and harbor users and other persons located in proximity to and affected by such activities due to the unique geographic and environmental characteristics of the [Port]." *NOSA Initial Decision*, 23 S.R.R. (P & F) at 708–09, 716.

Tariff I, imposed two charges to defray the costs of the police, fire, and emergency services the Port provided on the Mississippi River: a "Harbor Fee" on commercial vessels over 100 feet long that docked, moored or anchored in the Port, *Louis Dreyfus Corp. v. Plaquemines Port, Harbor & Terminal Dist.*, 21 S.R.R. (P & F) 219, 231–32 (I.D.1981) [hereinafter *"Dreyfus Initial Decision"*], *adopted*, 21 S.R.R. (P & F) 1072 (FMC 1982) [hereinafter *"Dreyfus Order"*], and a "Supplemental Harbor Fee" on cargo shipments over 500 tons when the cargo was handled within the Port. The Supplemental Harbor Fee could be set off against any Harbor Fee paid by the vessel carrying the cargo. *Dreyfus Initial Decision*, 21 S.R.R. (P & F) at 233, 239. Failure to pay Tariff I was made a misdemeanor, punishable by fine or imprisonment, *id.* at 237, and anyone placed on the delinquent list was "denied further use of the port or facilities by the [Port]" until payment was made. *Id.* at 238.

In 1978, Louis Dreyfus Corporation, a grain exporter using a terminal within the Port, filed suit in the Eastern District of Louisiana seeking to have Tariff I declared unconstitutional. That suit was consolidated with a number of suits brought by the Port to collect Tariff I and to enjoin those on the delinquent list from using the Port or any facilities until they paid the tariff.

In 1979, Louis Dreyfus filed a complaint with the FMC charging that Tariff I violated the Shipping Act of 1916 ("1916 Act"). *Dreyfus Initial Decision,* 21 S.R.R. (P & F) at 223, 225–26. The proceeding in the Eastern District of Louisiana was stayed, on Louis Dreyfus' motion, pending a decision on its FMC complaint. Eventually, the court case was dismissed.

After an evidentiary hearing, an Administrative Law Judge ("ALJ") held that the FMC had jurisdiction over the Port and that Tariff I violated sections 16 and 17 of the 1916 Act, 46 U.S.C. §§ 815 and 816 (1982). *Dreyfus Initial Decision,* 21 S.R. R. (P & F) 219. The Commission upheld the ALJ's rulings. *Dreyfus Order,* 21 S.R. R. (P & F) 1072. Vice Chairman Moakley, joined by Chairman Daschbach, dissented on the basis that the 1916 Act did not give the FMC jurisdiction over the Port. *Id.* at 1083. The Port petitioned for review in this court, but the case was settled and the petition withdrawn before argument. *See Plaquemines Port, Harbor & Terminal Dist. v. FMC,* No. 82–1941 (D.C.Cir. dismissed May 17, 1983).

The Port then held public hearings concerning the revision of Tariff I. In 1982, Tariff II, the tariff at issue in this case, was promulgated. *NOSA Initial Decision,* 23 S.R.R. (P & F) at 716.

Tariff II levied a "Harbor Fee" on "all commercial cargo vessels which dock, moor, or anchor" within the Port and an additional (not alternative) "Supplemental Harbor Fee" on commercial vessels transferring cargo within the Port. *NOSA Initial Decision,* 23 S.R.R. (P & F) at 720–21. Nonpayment of charges would result in denial of credit, and of access to the Port and the private facilities within its jurisdiction. *Id.* at 722–23. The criminal penalties of Tariff I were omitted.

Tariff II contained a number of exemptions. At issue in this appeal are those exemptions which relieve the following persons from paying Tariff II: (1) all privately owned commercial wharves and docks; (2) commercial fishing vessels, crew boats, and supply boats for oil rigs; and (3) the first 500 tons of cargo handled by a vessel. Like Tariff I, Tariff II contained liability and surety provisions which imposed direct liability on (1) vessel agents for fees owed by vessels and (2) vessels operating under FIO contracts for fees owed by cargo interests.

In 1983, petitioner NOSA, a non-profit organization of owners, stevedores, and vessel agents, filed a complaint with the FMC alleging that Tariff II violated the 1916 Act. Meanwhile Congress passed the 1984 Act which, in part, replaced and superseded the 1916 Act. 46 U.S.C. § 1701 *et seq.* (Supp. III 1985). After an evidentiary hearing, the ALJ again found that the FMC had jurisdiction over the Port. The ALJ held that the Port's exemptions violated section 10(b)(3) of the Shipping Act of 1984, but the ALJ upheld the provisions of Tariff II which imposed liability on vessel agents and vessels operating under FIO contracts. *NOSA Initial Decision,* 23 S.R.R. (P & F) 705. Both the Port and NOSA appealed to the Commission. *NOSA Order,* 23 S.R.R. (P & F) at 1366. The Commission upheld the ALJ's decision. *Id.*[2] Commissioner Moakley again dissented, arguing that the FMC had no jurisdiction over the Port. *Id.* at 1379–80.

Both the Port and NOSA appealed the Commission's decision. The Port petitioned for review in this court. NOSA petitioned for review in the Fifth Circuit. The Fifth Circuit transferred NOSA's petition here and the cases were consolidated. Although noted in its petition for review, in its brief before this court, the Port has dropped the jurisdictional argument and apparently concedes FMC jurisdiction over it. The jurisdictional issue survives, nonetheless. In its role as statutory respondent, pursuant to 28 U.S.C. §§ 2344 and 2348 (1982), the Department of Justice ("DOJ") argues that the FMC order must

---

2. The Commission's decision differs from that of the ALJ on the tonnage clause claim. The ALJ had reached the constitutional issues, *NOSA Initial Decision,* 23 S.R.R. (P & F) at 734–35, while the Commission deferred resolution of the constitutional issues to the federal courts. *NOSA Order,* 23 S.R.R. (P & F) at 1372–73. These issues are discussed *infra* pp. 544–546.

be set aside for lack of agency jurisdiction.[3] The Port argues that Tariff II's exemptions do not violate the 1984 Act and NOSA defends the FMC's decision that those exemptions are unreasonable and unduly prejudicial, and thus violate the 1984 Act.

NOSA continues to argue that the provisions of Tariff II attaching liability to vessel agents and vessels operating under FIO contracts are unreasonable. NOSA also renews its claim that Tariff II is a duty of tonnage forbidden by the tonnage clause of the United States Constitution. U.S. Const. art. I, § 10, cl. 3. In a supplemental brief, NOSA raises additional statutory arguments based on 33 U.S.C. § 10 (1982), the statute admitting Louisiana to the Union, and the Harbor Development and Navigation Improvement Act of 1986. 33 U.S. C.A. § 2236 (West Supp.1987). NOSA's supplemental brief also asserts, for the first time, that Tariff II violates the commerce clause and imposes a constitutionally prohibited duty on imports. U.S. Const. art. I, § 8 & § 10, cl. 3.

In the meantime, the Port has revised Tariff II to conform with the requirements of the FMC order. The newest tariff ("Tariff III") has been approved by the FMC. *New Orleans S.S. Ass'n v. Plaquemines Port, Harbor & Terminal Dist.*, 816 F.2d 1074, 1076 (5th Cir.1987).[4] NOSA has filed suit in the Eastern District of Louisiana arguing that Tariff III is unconstitutional. That suit has been stayed pending our decision in this case. *New Orleans S.S. Ass'n v. Plaquemines Port, Harbor & Terminal Dist.*, No. 87–2548 (E.D.La. Nov.

17, 1987). Only the Tariff II issues are before us.

### III.

■ We address the FMC's jurisdiction first. Jurisdiction is governed by the 1984 Act's definition of "marine terminal operator." Section 3(15) of the 1984 Act, 46 U.S.C. § 1702(15) (Supp. III 1985), states that a marine terminal operator is a person engaged "in the business of furnishing wharfage, dock, warehouse, or other terminal facilities in connection with a common carrier." If the Port engages in "furnishing ... other terminal facilities," it is a "marine terminal operator" and falls under the 1984 Act and the FMC's jurisdiction. As noted in the legislative history of the 1984 Act, H.R.Rep. No. 53, 98th Cong., 2d Sess., pt. 1, at 29, *reprinted in* 1984 U.S. Code Cong. & Admin.News 167, 194, the relevant language was taken directly from the definition of "other person subject to [the 1916 Act]." 46 U.S.C. § 801 (1982).[5] For this reason, the intent behind, and prior interpretations of, the 1916 Act's provisions have continuing precedential force.

The 1916 Act was designed to strengthen the U.S. shipping industry. Then, as now, shippers operated in cartels, often called "conferences." Congress believed that U.S. shippers could not opt out of the international cartel system and survive at the level thought required by national needs and security. The 1916 Act, therefore, granted antitrust immunity to shippers' cartels. In exchange, the cartels were subjected to the provisions of the 1916 Act

---

**3.** NOSA argues that DOJ is barred from raising the jurisdictional issue. The case upon which NOSA relies, however, *Cargill v. FMC,* 530 F.2d 1062 (D.C.Cir.), *cert. denied,* 429 U.S. 868, 97 S.Ct. 179, 50 L.Ed.2d 148 (1976), is not on point. In *Cargill,* this court barred DOJ from raising a legal theory that had neither been presented to the FMC nor made the subject of the petition for review. 530 F.2d at 1071. The jurisdictional issue here, however, was raised both before the FMC and in the Port's petition for review. In any event, the fact that the Port has abandoned the jurisdictional issue does not confer jurisdiction on the agency if none exists. Agency jurisdiction, like subject matter in the federal courts, cannot be achieved by consent of the parties.

**4.** The Fifth Circuit case arose because NOSA filed suit in the Eastern District of Louisiana to enjoin the Port from collecting any fees pursuant to Tariff II. After the adoption of Tariff III, the district court judge dismissed the case as moot. The Fifth Circuit affirmed. 816 F.2d at 1074.

**5.** Section 1 of the 1916 Act (formerly 46 U.S.C. § 801 (1982)) defined "other person" subject to the 1916 Act as meaning:

... any person not included in the term "common carrier by water," carrying on the business of forwarding or furnishing wharfage, dock, warehouse or other terminal facilities in connection with a common carrier by water.

which prohibited discriminatory practices and required the filing and publication of tariffs with the FMC. Essay, *The Shipping Act of 1984: A Return to Antitrust Immunity*, 14 Transp.L.J. 153, 155–56 (1985).

In order to regulate the shippers' cartels effectively, it was necessary to regulate other links in the transportation chain. The sponsor of the 1916 Act, Congressman Alexander, in response to an amendment to strike "other person" subject to the Act, explained that, in order for regulation of the shippers to be effective, the FMC must also "have supervision of all those incidental facilities connected with the main carriers." 53 Cong.Rec. 8276 (1916). Alexander stated that the bill contained no provision regulating shippers that did not also apply to terminal facilities. *Id.* Moreover, he noted, if terminal facilities owned and operated by state political subdivisions discriminated unduly, they, too, would be subject to the 1916 Act. In 1943, the Supreme Court relying on Congressman Alexander's remarks, held that waterfront terminals owned and operated by municipalities were "other person[s] subject to the [1916 Act]." *California v. United States*, 320 U.S. 577, 585–86, 64 S.Ct. 352, 356–57, 88 L.Ed. 322 (1944).

In its 1982 *Dreyfus Order*, the FMC relied upon *California v. United States*'s ruling that local government authorities are covered by the statute. The FMC then focused on the Port's degree of involvement in the provision of terminal facilities to determine whether that involvement was sufficient to constitute the "furnishing" of the facilities. Since the Port assessed a fee for its essential services ancillary to the facilities and conditioned access to the private facilities within its jurisdiction upon payment of that fee, the FMC found a "furnishing" of the facilities. As the FMC noted, the Port "has imposed utilization of its services and payment of its fee as an unavoidable appurtenance to all private facilities." 21 S.R.R. (P & F) at 1080.

In the order now before us, the FMC applied the same rationale to determine

that the Port is a "marine terminal operator" within the meaning of the 1984 Act. *NOSA Order*, 23 S.R.R. (P & F) at 1372. We agree with the FMC that the Port's combination of offering essential services and controlling access to the private facilities amounts to the furnishing of terminal facilities. Like the FMC, we read the purpose of the relevant portions of the 1916 Act, and its successor, the 1984 Act, to be the prevention of discrimination in the provision of terminal facilities. Ownership or operation of terminal facilities is not a necessary prerequisite to the ability to discriminate. Thus, the critical issue for jurisdiction is that the degree of the Port's involvement enables the Port to discriminate. In this case, the Port has the ability to discriminate in the fees it charges by controlling access to private terminal facilities. This is sufficient to sustain FMC jurisdiction.

Our conclusion is buttressed by the fact that in a previous interpretation of the provision at issue here, the Supreme Court focused on the Shipping Act's legislative scheme and required a broad construction to make effective the scheme of regulation the statute established. *United States v. American Union Transp.*, 327 U.S. 437, 447–57, 66 S.Ct. 644, 649–54, 90 L.Ed. 772 (1946). The FMC has twice found that the Port's tariffs, or at least portions of them, violate substantive provisions of the Shipping Acts. It should be clear by now that allowing such discrimination would nullify the Shipping Acts for the first 100 miles of the Mississippi River north of the Gulf.

The DOJ argues that upholding FMC jurisdiction over the Port could result in the FMC controlling the fire and emergency services of every waterside city in America. This argument is overstated. Waterside cities will not automatically or accidentally fall into FMC jurisdiction. Only if such ports begin to charge a fee for their services and to control access to private facilities to enforce their charges will today's decision bring them within the jurisdiction of the FMC.[6]

6. Though it is not relevant to our interpretation of the statute, it may be noted that the Port is, in

## IV.

### A.

The FMC argues that we may not reach the tonnage clause issue.[7] The FMC's argument fails to distinguish two analytically distinct issues. The first is whether the FMC properly declined to reach the tonnage clause claim. The second is whether we may reach it.

 It was entirely correct for the FMC to decline to decide the tonnage clause issue, *see, e.g., Motor & Equip. Mfrs. Ass'n v. EPA,* 627 F.2d 1095, 1114–15 (D.C.Cir.1979), on the ground that the federal courts provide more appropriate forums for constitutional claims. *NOSA Order,* 23 S.R.R. (P & F) at 1372–73. Administrative agencies are entitled to pass on constitutional claims but they are not required to do so merely because their members, like all government personnel, owe allegiance to the Constitution. *Motor & Equip. Mfrs. Ass'n,* 627 F.2d at 1115. *But cf. Meredith v. FCC,* 809 F.2d 863 (D.C.Cir. 1987) (where agency itself has cast grave legal doubt on the constitutionality of its own policy, administrative law judge should consider constitutional defense in an enforcement proceeding). The tonnage clause challenge to the Port's tariff is not within the mandatory jurisdiction of the FMC's enabling legislation which directs the FMC to evaluate tariffs under the Shipping Acts' reasonableness and anti-discrimination standards.

 It does not follow that this court may not reach the tonnage clause issue. The FMC argues that § 706 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 (1982), and the Hobbs Act, 28 U.S.C. § 2342 (1982), preclude us from reaching a constitutional issue if the agency declines to reach it. The argument is clearly wrong. *See, e.g., Reid v. Engen,* 765 F.2d

1457, 1461 (9th Cir.1985); *Motor & Equip. Mfrs. Ass'n v. EPA,* 627 F.2d at 1114–15. As we noted in *Motor & Equipment Manufacturers,* where the petitioners have exhausted the possibility that the agency may decide in their favor on nonconstitutional grounds, they may, through their petition for review, raise constitutional claims not decided by the agency. *Id.* at 1115.

*Southern Ohio Coal Co. v. Donovan,* 774 F.2d 693, 700–01 (6th Cir.1985), cited by the FMC, is not on point. *Southern Ohio* involved an exclusive grant, under the Mine Act, 30 U.S.C. § 816 (1982), to the courts of appeals to review orders of the Federal Mine Safety and Health Review Commission. In that case, the Secretary argued that the exclusive grant of jurisdiction to the courts of appeals precluded the plaintiffs from suing in district court to determine the constitutionality of the Mine Commission's rules and procedures. The plaintiffs argued that the absence of an express limitation on the district court's jurisdiction rendered proper an adjudication of the constitutionality of the Commission's procedures. 774 F.2d at 700. The court sided with the plaintiffs, holding that the district courts had a residuum of federal question jurisdiction under which they could evaluate the Commission's procedures. *Id.* The court's decision in *Southern Ohio,* which found jurisdiction in the district court, has nothing to do with whether an appellate court may reach constitutional issues which the agency has declined to reach.

 Finally, the FMC argues that cases arising under the Constitution must be brought in the district courts under 28 U.S.C. § 1331 (1982). The FMC confuses the grant of federal question jurisdiction to district courts with an exclusive grant of jurisdiction. There is nothing in section 1331 which excludes the appellate courts from considering constitutional issues in a

---

any case, unique. It is the only port authority which operates without either tax support or revenue from wharf and dock facilities. Reply Brief at 3. Other ports have neither the need nor the incentive to structure their operations as the Port does. Moreover, the FMC already has jurisdiction over the vast majority of municipal

ports. *California v. United States,* 320 U.S. 577, 64 S.Ct. 352, 88 L.Ed. 322 (1944).

7. We note at the outset that, unlike the constitutional issues we do not reach, *see infra* pp. 550 –551, there is no problem with the adequacy of the record on the tonnage clause issue.

petition for review. We now turn to the merits of the tonnage clause claim.

## B.

Our analysis of the tonnage clause is a direct application of the Supreme Court's decision in *Clyde Mallory Lines v. Alabama*, 296 U.S. 261, 56 S.Ct. 194, 80 L.Ed. 215 (1935). The Port of Mobile, Alabama policed the harbor to insure the safety and facility of the movement of vessels. *Id.* at 266, 56 S.Ct. at 196. It charged a fee for the purpose of meeting the expenses associated with the supervision of the port and the execution of its regulations. *Id.* at 264, 56 S.Ct. at 195. The Court noted that the tonnage clause prohibits "all taxes and duties regardless of their name or form, and even though not measured by the tonnage of the vessel, which operate to impose a charge for the privilege of entering, trading in, or lying in a port." *Id.* at 265–66, 56 S.Ct. at 196. The clause does not, however, prohibit charges made by a state authority for services rendered such as pilotage, wharfage, charges for the use of locks, or fees for medical inspections. *Id.* The Court therefore upheld Mobile's fee.

 The *Clyde Mallory* Court distinguished the general services rendered by the Port of Mobile from earlier cases which involved a tax, levied in the guise of wharfage or medical inspections. *Steamship Co. v. Portwardens*, 73 U.S. (6 Wall.) 31, 18 L.Ed. 749 (1867); *Peete v. Morgan*, 86 U.S. (19 Wall.) 581, 22 L.Ed. 201 (1873); and *Cannon v. New Orleans*, 87 U.S. (20 Wall.) 577, 22 L.Ed. 417 (1874). The latter were condemned because they were imposed on all vessels entering a port whether or not they received the benefit of the services. *Clyde Mallory*, 296 U.S. at 266, 56 S.Ct. at 196. In contrast, the services rendered by

the Port of Mobile inured to all who entered the port. A reasonable charge for general services is not a prohibited tonnage duty. *Id.* at 267, 56 S.Ct. at 196–97. The services rendered by the Port also inure to all who use the Port of Plaquemines. All vessels, whether or not they catch fire or need rescue services, benefit from their availability.[8] Given the seriousness of explosions, fires or other accidents, particularly in view of the crowded condition of this stretch of the Mississippi River, it is especially important that rescue operations be swift and that fires be promptly extinguished.

NOSA argues, apparently in the alternative, that *Clyde Mallory* is an anomaly. NOSA here relies on Madison's notes of the Constitutional Convention for the proposition that the tonnage clause prohibits even tariffs levied for services which inure to the benefit of all vessels. This argument, even if correct, would be unavailing. As a court of appeals, we are bound by Supreme Court precedent rather than by Madison's notes.

In any event, Madison's notes of the Convention are inconclusive on this point and would not help us to resolve the issue even in the absence of binding precedent. The tonnage clause was first presented when the Convention discussed article I, section 10, which enumerates the prohibitions upon the states. The representatives from Maryland suggested a proviso that "no state shall be restrained from laying duties of tonnage for the purpose of clearing harbors and erecting light-houses." 2 *Records of the Federal Convention of 1787*, at 625 (M. Farrand ed. 1966). Colonel Mason urged support of the Maryland proposal, pointing to the peculiar needs of the Chesa-

---

**8.** In *Clyde Mallory*, all who paid received proportionate benefits, which made the fees lawful. In the disguised tax cases, some paid who received no benefits, which made the fees unlawful. The present case is different from either of these situations in that some who receive benefits do not pay (the passing ship that does not stop at the Port is protected but pays no fee). The services the Port provides are obviously more valuable to ships that dock, moor, or load or unload cargo in the Port. Thus the slight

divergence between the class that benefits and the class that pays seems of no significance under the rationale of *Clyde Mallory*. No ship is charged without receiving a benefit. The fees do no more than closely approximate the costs of the services provided and can hardly be rendered unconstitutional on the ground that the Port does not stop each passing ship to demand a small contribution. Benefits and fees have been apportioned as closely as is practicable.

peake which required such expenses. Gouverneur Morris replied that as the Constitution then stood, the states were not prohibited from laying duties of tonnage. Gouverneur Morris worried that the exception proposed by the Maryland representatives would imply the opposite and put the states in a worse position.

Mr. Madison disagreed; he was of the opinion that the commerce clause independently restrained the states from imposing duties of tonnage. He stated that he had become convinced that "the regulation of commerce [is] in its nature indivisible and ought to be wholly under one authority." 2 *Records of the Federal Convention of 1787, supra,* at 625. Mr. Sherman argued that since the power of the federal government was supreme, concurrent regulation of commerce was not dangerous. Mr. Langdon, however, insisted that the regulation of tonnage was an essential regulation of trade and the states ought to have nothing to do with it. He then proposed the tonnage clause and it passed. *Id.*

NOSA accurately notes that the tonnage clause was passed in response to the proviso suggested by the Maryland delegates. NOSA argues that the purpose of the tonnage clause was to restrain Maryland from laying duties to pay for erecting lighthouses and clearing harbors. And, therefore, the Port must also be restrained from charging a tariff for similar services.

It is not clear, however, that the tonnage clause was passed to restrain Maryland from laying such duties. Indeed, the Maryland delegates voted for the tonnage clause as proposed by Mr. Langdon. 2 *Records of the Federal Convention of 1787, supra,* at 626. It is just as likely that the convention passed the tonnage clause to make it clear that Congress had the power, under the commerce clause, to regulate tonnage duties and to prevent the states from lay-

ing tonnage duties for the purpose of regulating trade.

The *Clyde Mallory* Court, which explicitly considered that portion of Madison's notes relied upon by NOSA, 296 U.S. at 265 n. 1, 56 S.Ct. at 196 n. 1, reasoned that at the time of the adoption of the Constitution, duties of tonnage were understood to be distinct from fees charged for services such as pilotage, towage, and charges for loading and unloading and the like. *Id.* at 265, 56 S.Ct. at 196. The Supreme Court held that the fact that the services at issue inured to the benefit of all, rather than to particular vessels, did not render them any less a service. *Id.* at 266, 56 S.Ct. at 196. The Port's practice of assessing a fee for its general services is, therefore, not a violation of the tonnage clause.

## V.

In the proceeding below, the ALJ found, and the Commission agreed, that the tariff exemptions for (1) the first 500 tons of cargo handled, (2) the private terminal facilities, and (3) small craft violated the 1984 Act. *NOSA Initial Decision,* 23 S.R.R. (P & F) at 735–44; *NOSA Order,* 23 S.R.R. (P & F) at 1376–79.

Explication of the applicable statutory language is slightly complicated by the passage of the 1984 Act. That there may be no confusion about the applicable standards, we begin by matching the applicable 1984 Act provisions with their predecessors in the 1916 Act.

Section 10(d)(1) of the 1984 Act is, with reference to "marine terminal operators," a recodification of section 17 of the 1916 Act. Section 10(d)(1) requires that marine terminal operators "establish, observe, and enforce just and reasonable regulations and practices." 46 U.S.C. § 1709(d)(1) (Supp. III 1985).[9] Section 10(d)(1) thus creates a reasonableness standard.

---

9. Section 10(d)(1) of the 1984 Act, 46 U.S.C. § 1709(d)(1) (Supp. III 1985), provides:
 No common carrier, ocean freight forwarder, or marine terminal operator may fail to establish, observe, and enforce just and reasonable regulations and practices relating to or connected with receiving, handling, storing, or delivering property.

Section 17 of the 1916 Act (formerly 46 U.S.C. § 816 (1982)) required in pertinent part:
 Every such carrier and every other person subject to this chapter shall establish, observe, and enforce just and reasonable regulations and practices relating to or connected with the receiving, handling, storing, or delivery of property. Whenever the Commission finds

Similarly, sections 10(b)(11) and 10(b)(12), made applicable to marine terminal operators by section 10(b)(3), essentially recodify the standards of section 16 First of the 1916 Act.[10] Section 10(b)(11) makes it unlawful for a marine terminal operator to "make or give any undue or unreasonable preference or advantage to any particular person, locality, or description of traffic...." 46 U.S.C. § 1709(b)(11) (Supp. III 1985). Section 10(b)(12) makes it unlawful for a marine terminal operator to "subject any particular person, locality, or description of traffic to ... any unreasonable prejudice or disadvantage...." 46 U.S.C. § 1709(b)(12) (Supp. III 1985). Sections 10(b)(11) and 10(b)(12) thus create an anti-discrimination standard.

The FMC found that the Port's exemptions violated both the reasonableness and the anti-discrimination standards.

The Supreme Court has held that the reasonableness standard requires that the "charge levied [must be] reasonably related to the services rendered." *Volkswagenwerk Aktiengesellschaft v. FMC*, 390 U.S. 261, 282, 88 S.Ct. 929, 941, 19 L.Ed.2d 1090 (1968); *see also Baton Rouge Marine Contractors, Inc. v. FMC*, 655 F.2d 1210 (D.C. Cir.1981). *Volkswagenwerk* involved an agreement among common carriers, terminal operators, and stevedores allocating the costs of a mechanization fund to compensate unionized labor. In that case, Volkswagen, a shipper, alleged that the alloca-tion formula unfairly and unreasonably burdened its particular description of traffic. The Supreme Court held that "[t]he question under § 17 [now § 10(d)(1) ] is not whether the petitioner has received some substantial benefit ..., but whether the correlation of that benefit to the charges imposed is reasonable." 390 U.S. at 282, 88 S.Ct. at 940. In *Baton Rouge*, which concerned the allocation of terminal charges among the users of terminal services, this court explained that "if the challenger pays more than other parties pay, for fewer benefits than other parties receive, then the charge is unreasonable under § 17 [now § 10(d)(1) ]." 655 F.2d at 1217. In the proceeding below, the ALJ examined Tariff II to determine whether the charges collected under Tariff II bear a reasonable relationship to the comparative benefit received by the asserted parties. *NOSA Initial Decision*, 23 S.R.R. (P & F) at 735.

 Application of the *Volkswagenwerk* standard requires matching costs assessed to the benefits received. The ALJ found that the Port's allocation of its overall cost of fire and emergency services was reasonable. *NOSA Initial Decision*, 23 S.R.R. (P & F) at 736. However, the ALJ determined that Tariff II's exemptions violated the *Volkswagenwerk* standard by creating an improper allocation of the cost of the Port's services among the recipients of those services. *Id.* Because the costs

---

that any such regulation or practice is unjust or unreasonable it may determine, prescribe, and order enforced a just and reasonable regulation or practice.

**10.** Section 10(d)(3) of the 1984 Act, 46 U.S.C. § 1709(d)(3) (Supp. III 1985), provides:

The prohibitions in subsection (b)(11), (12), and (14) of this section apply to marine terminal operators.

Section 10(b)(11) and (12) of the 1984 Act, 46 U.S.C. § 1709(b)(11) and (12) (Supp. III 1985), provides:

(b) COMMON CARRIERS.—No common carrier, *either alone or in conjunction with any other person, directly or indirectly,* may—

 ....

(11) except for service contracts, make or give any undue or unreasonable preference or advantage to any particular person, locality, or description of traffic in any respect whatsoever;

(12) subject any particular person, locality, or description of traffic to an unreasonable refusal to deal or any undue or unreasonable *prejudice or disadvantage in any respect* whatsoever.

Section 16 of the 1916 Act (formerly 46 U.S.C. § 815 First (1982)) stated in pertinent part:

It shall be unlawful for any common carrier by water, or other person subject to this Chapter, either alone or in conjunction with any other person, directly or indirectly—

First. To make or give any undue or unreasonable preference or advantage to any particular person, locality, or description of traffic in any respect whatsoever, or to subject any particular person, locality, or description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever....

were allocated so that entities benefiting from the Port's services were exempted from tariff charges, the ALJ found that the exemptions were unreasonable under section 10(d)(1) of the 1984 Act. *Id.* The Commission agreed. *NOSA Order*, 23 S.R.R. (P & F) at 1377.[11]

The FMC also determined that the exemptions violated the anti-discrimination standard. In the proceeding below, the Commission held that the tariff exemptions favored local interests. *NOSA Order*, 23 S.R.R. (P & F) at 1376. The ALJ found, and the Commission agreed, that the burden of going forward with the evidence shifted to the Port once NOSA had made a showing that the Port's services benefited users who were exempted from the fees. *NOSA Order*, 23 S.R.R. (P & F) at 1376–77. The Port then presented evidence in support of the exemptions and NOSA submitted rebuttal evidence. *Id.* The FMC held that the Port failed to justify the discrimination caused by the exemptions either by showing that they were required administratively or by showing that the benefited users paid revenue to the Port in other ways. *Id.* at 1366–67.

■ Our review is limited to determining whether the evidence, as a whole, supports the FMC's determination that the exemptions were unreasonable under section 10(d)(1) and discriminatory under sections 10(b)(11) and 10(b)(12). *Consolo v. FMC*, 383 U.S. 607, 618–19, 86 S.Ct. 1018, 1025–26, 16 L.Ed.2d 131 (1966); *National Ass'n of Recycling Indus., Inc. v. FMC*, 658 F.2d 816, 824 n. 39 (D.C.Cir.1980). We hold that the FMC's determinations are supported by the evidence.

■ The Port argued that the exemption for the first 500 tons was required because it would be administratively burdensome to send many bills for small amounts. The Port's exemption amounts to a $20.00 loss of revenue per shipment. But the Port's own evidence showed that

most ports follow a practice of assessing a $20.00 minimum charge and revealed that it is economically feasible to bill for that amount. *NOSA Order*, 23 S.R.R. (P & F) at 1377–78. Thus, the Port failed to show why it was necessary for small shipments to be subsidized by larger shipments. *Id.* at 1378.

The FMC's conclusion that private terminals and wharves receive substantial benefits from the Port's emergency and fire services for which they do not pay is clearly supported by the evidence. Again, the Port's own evidence showed that the private terminals receive substantial benefits from the Port's services. *NOSA Initial Decision*, 23 S.R.R. (P & F) at 737–38. Moreover, the preamble to the tariff itself states that its purpose is to defray the cost of extinguishing fires on the private wharves and docks. *Id.* at 737. The ALJ correctly found that the Port did not receive other revenues from the private terminals which would justify the exemption. *Id.* at 737–38.

The record also supports the Commission's conclusion that the exemption for small craft was too broad. *NOSA Initial Decision*, 23 S.R.R. (P & F) at 739–40; *NOSA Order*, 23 S.R.R. (P & F) at 1378. Substantial local commercial interests, such as commercial fishing vessels unloading tons of fish each day, were exempted. *Id.* The Commission determined that a *de minimis* exception for small boats, the "mosquito fleet," would be reasonable. Exempting substantial commercial interests was not. *Id.*

## VI.

■ Tariff II contains surety and liability provisions which hold vessel agents liable for the tariff debts of their principals. The tariff also contains a provision which states that by their use of the Port and the facilities within it, vessel agents consent to pay the charges of their principals. *NOSA*

---

11. As we discussed *supra* note 8, ships which pass through the Port without stopping receive some benefit yet pay no fee. Exempting such ships, however, does not create an improper *Volkswagenwerk* allocation. The benefits which passing ships receive is relatively small whereas the administrative burden of collection is great. Once again, benefits and fees have been apportioned as closely as is practicable.

*Initial Decision,* 23 S.R.R. (P & F) at 718. NOSA challenges the FMC's determination that such liability provisions are reasonable under section 10(d)(1). *NOSA Order,* 23 S.R.R. (P & F) at 1374–75. NOSA argues that, under the *Volkswagenwerk* standard, it is unreasonable for vessel agents to be held liable for the tariff fees of their principals. According to NOSA, as a result of the surety and liability provisions, the fees which vessel agents pay are greater than the benefits received. The Port, and the FMC, argue that the *Volkswagenwerk* standard is inapplicable to the surety and liability provisions.

The Supreme Court's holding in *Chevron U.S.A. Inc. v. NRDC,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984), governs our review of the FMC's statutory interpretation. Congress has not spoken to the precise question at issue here—whether holding vessel agents liable for the debts of their principals is unreasonable under section 10(d)(1). 46 U.S.C. § 1709(b)(1) (Supp. III 1985). By its broad language, which sets forth a "reasonableness" standard, Congress has explicitly delegated responsibility for administering the statutory program to the FMC. *INS v. Cardoza–Fonseca,* — U.S. —, 107 S.Ct. 1207, 1222, 94 L.Ed.2d 434 (1987). Therefore, we must accept the FMC's interpretation if it is a reasonable application of the statute to the facts of this case. *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782.

In a previous case, affirmed without opinion by this court, the FMC established the basic rule on liability provisions in terminal tariffs. Any person who is a "user" of terminal facilities may be held liable for tariff charges related to that use. *West Gulf Maritime Ass'n v. Port of Houston Auth.,* 18 S.R.R. (P & F) 783 (1978) ("*WGMA I*"), *aff'd without opinion,* 610 F.2d 1001 (D.C.Cir.1979), *cert. denied,* 449 U.S. 822, 101 S.Ct. 81, 66 L.Ed.2d 24 (1980). The rationale is that a marine terminal operator may impose reasonable conditions on the use of its facilities in order to ensure the collection of tariff charges. *NOSA Order,* 23 S.R.R. (P & F) at 1374. The term "user" includes persons, such as vessel agents, who use terminal facilities indirectly. 18 S.R.R. (P & F) at 790.

In *WGMA I,* the terminal operators had experienced significant difficulty and resulting financial losses in collecting fees from vessel owners and operators who did not maintain a permanent presence in the port. *NOSA Order,* 23 S.R.R. (P & F) at 1375. The vessel agents, who profited from the use of the facilities by their principals, refused to pay or aid in the collection of delinquent accounts. *NOSA Order,* 23 S.R.R. (P & F) at 1375.

In *WGMA I,* the FMC found that the liability and surety provisions were a reasonable method of collecting fees lawfully due. *WGMA I,* 18 S.R.R. (P & F) at 790–91; *NOSA Order,* 23 S.R.R. (P & F) at 1375. The FMC reasoned that the *WGMA I* agents, by their course of conduct, had separately contracted with the terminal operators to be responsible for their principals' fees. The FMC also reasoned that vessel agents could protect themselves by entering into appropriate contractual arrangements with their principals. Vessel agent liability was deemed a minimal imposition on vessel agents in light of the benefits they received from using the terminals. *WGMA I,* 18 S.R.R. (P & F) at 790–91; *NOSA Order,* 23 S.R.R. (P & F) at 1375.

In the proceeding below, the FMC explained that the standard of reasonableness under *WGMA I* is distinct from the *Volkswagenwerk* standard. *NOSA Order,* 23 S.R.R. (P & F) at 1375; *Harrington & Co. v. Georgia Ports Auth.,* 23 S.R.R. 753 (P & F) 767–71 (I.D.), *adopted,* 23 S.R.R. 1276 (P & F) 1283 (1986). *Volkswagenwerk* involves the allocation of charges among multiple direct users of a common service. *Harrington,* 23 S.R.R. (P & F) at 769. The ultimate purpose of the test is to ensure that no user of the services pays a disproportionate amount. *Id.*

*WGMA I* involves the reasonableness of a tariff collection practice. The question is whether it is reasonable to hold indirect users liable for the debts incurred by their principals, the direct users. The FMC has consistently upheld such tariff collection practices as a reasonable means

of collecting tariff fees due. Under *WGMA I,* the critical question is whether, by doing business within the Port, vessel agents, either directly or indirectly, voluntarily use the Port's services and derive a benefit substantial enough to warrant potential liability for their principals' charges. The FMC reasoned that such liability and surety provisions are not an allocation of charges. Moreover, the costs and benefits of indirect use cannot be measured and compared with the costs and benefits of direct use. Thus, the *Volkswagenwerk* standard which applies to the allocation of direct charges is inapplicable. *NOSA Order,* 23 S.R.R. (P & F) at 1375. The FMC's interpretation of section 10(d)(1) distinguishes between the allocation of charges among direct users for direct benefits and a collection practice which holds indirect users liable for the debts of their principals. We cannot say that the FMC's interpretation is unreasonable and thus, following the Supreme Court's teaching in *Chevron,* we uphold it.

NOSA also challenges those provisions of Tariff II which hold vessels operating under FIO contracts liable for the cargo charges. The FMC saw no legal distinction between FIO contracts and vessel agents. *NOSA Order,* 23 S.R.R. (P & F) at 1376. Neither do we. Both cases hold an indirect but local beneficiary liable for charges incurred by a nonlocal contract partner who is a direct beneficiary. Both are reasonable means of assuring that charges are not evaded. In both cases, moreover, the indirect beneficiary can protect itself by contractual arrangement.

### VII.

■ In a "supplemental brief," NOSA makes a number of completely new arguments. NOSA argues that the tariff violates 33 U.S.C. § 10 (1982), the statute admitting Louisiana to the Union, and the Harbor Development and Navigation Improvement Act of 1986, 33 U.S.C.A. § 2236 (West Supp.1987). NOSA also uses its "supplemental brief" to assert that the tariff violates the dormant commerce clause and the foreign commerce clause. The FMC, supported by the Port, moved to strike NOSA's "supplemental brief" and the arguments contained in it. We deferred resolution of this motion until after oral argument. *New Orleans S.S. Ass'n v. Plaquemines Port, Harbor & Terminal Dist.,* No. 86–1517 (D.C.Cir. Aug. 11, 1987).

Rule 11(h) of this court provides for the filing of a supplemental brief "limited to the citation and discussion of authorities issued since the filing of the party's last brief." D.C.Cir.R. 11(h). This rule is based on Rule 28(j) of the Federal Rules of Appellate Procedure, which allows a party to bring to the attention of the court "pertinent and significant authorities [which have] come to the attention of the party after the party's brief has been filed." Fed.R.App.P. 28(j). Rule 28(j) requires that supplemental filings shall state without argument the reasons for the supplemental citations. As this court has had occasion to note, the boundary between stating the reasons for a citation and argument can be hard to police. *South Carolina Elec. & Gas Co. v. ICC,* 734 F.2d 1541, 1546 (D.C.Cir.1984). In the instant case, however, ascertaining that boundary is not difficult. NOSA's "supplemental brief" is an undisguised attempt to introduce new legal theories into the case. Even a cursory glance reveals that NOSA's "supplemental brief" raises new issues and arguments not stated in its original brief and wholly unrelated to the FMC order. These new arguments are not properly before the court. *See* 734 F.2d at 1546.

NOSA argues that its "supplemental brief" should be accepted because, when its case was transferred from the Fifth Circuit, the briefing schedule was also changed. As a result, NOSA's "supplemental brief" was, in fact, filed before the respondent's and intervenor's briefs were even due. This argument misses the point. NOSA had already filed its main brief. The second brief, which it calls "supplemental," was not that at all. Supplemental briefs are permitted in order to provide an opportunity for litigants to inform the court about late authorities, new legislation, or other matters not available at the time of the original brief. *See* 16 C.

Wright, A. Miller, E. Cooper & E. Gressman, *Federal Practice and Procedure* § 3974, at 428 (1977); *id.* § 3974, at 409–10 (Supp.1987). Supplemental briefs do not provide an opportunity to convert review of an agency order into a broadbased statutory and constitutional attack. Yet it is this latter opportunity which NOSA seeks. Its "supplemental brief" is nothing more than a poorly disguised attempt to file a second main brief to advance arguments overlooked in its first main brief. We grant the motion to strike the "supplemental brief."

■■■ Even if we did not strike NOSA's "supplemental brief," we would be unable to consider the arguments and issues raised in it. Statutory claims which are not made before the agency may not be presented for the first time to the reviewing court. *See, e.g., Washington Ass'n for Television & Children v. FCC,* 712 F.2d 677, 680 (D.C.Cir.1983). It would therefore be inappropriate for us to reach any of the new statutory claims presented in the "supplemental brief." The proper forum for such complaints, which raise statutory claims outside of the FMC's mandate to enforce the Shipping Acts, is in the district court.

■■■ This court may reach constitutional issues not reached by the agency. We must rely, however, on the factual record transmitted to us by the agency. In this case, the record is simply devoid of any of the factual information we would need to reach a legal conclusion on the constitutional claims raised in the "supplemental brief." Courts do not decide constitutional issues on hypothetical facts. Even if we were to accept the "supplemental brief" and consider the constitutional arguments raised therein, we would be unable to decide them.

NOSA's suit in the Eastern District of Louisiana is the proper vehicle for it to raise the claims contained in its "supplemental brief" and to make the record necessary for the adjudication of those claims.

Given NOSA's performance with its "supplemental brief," it is ironic that NOSA seeks damages against the Port pursuant to Federal Rule of Appellate Procedure 38, contending that the Port's appeal is frivolous. The Port's appeal is certainly insubstantial and borders on the frivolous. On the other hand, NOSA's appeal is no more substantial and its disingenuous use of the supplemental brief procedure comes close to warranting sanctions. We have decided, however, not to award damages or to impose sanctions but to let matters rest where they are. For the foregoing reasons, the petitions for review are denied.